UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ARABIA WHITFIELD, *et al.*　　　　　　　　　　　CIVIL ACTION

VERSUS　　　　　　　　　　　　　　　　　　　　NO. 09-1877 c/w
　　　　　　　　　　　　　　　　　　　　　　　　　　09-8074
WARREN RILEY, *et al.*

　　　　　　　　　　　　　　　　　　　　　　　　　SECTION M (2)

**ORDER & REASONS**

Before the Court is the *Daubert* motion *in limine* of plaintiff Arabia Whitfield to limit and/or exclude the testimony of Byron Winbush.[1] Defendants Warren Riley, Joseph Meisch, Daniel Scanlan, Greg Lapin, Steven Keller, Marcellus White, Julio Alonzo, Larisa Austin, Regina Barr, Colette Booth, and the City of New Orleans (together, "Defendants") oppose the motion.[2] Whitfield replies in further support of her motion.[3] On April 30, 2021, the Court heard oral argument and took the motion under submission.[4] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons allowing Winbush to testify, but limiting the degree of his testimony.

**I.　　BACKGROUND**

This case arises from the fatal police shooting of Adolph Grimes, III in the early-morning hours of January 1, 2009. An important factual dispute in this case is (1) whether Grimes was holding his 9 mm gun in his hand, and (2) if he did have the gun in his hand, whether he fired the

---

[1] R. Doc. 122.
[2] R. Doc. 133.
[3] R. Doc. 153.
[4] R. Doc. 175.

gun at the officers.  Grimes had a valid permit to carry the 9 mm Glock he had in his car on the night of the shooting.[5]

Detective Ryan Aucoin of the New Orleans Police Department (the "NOPD") examined the 9 mm gun at the scene.[6]  He testified that "[w]hen I racked the slide of the firearm back, a spent shell casing ejected."[7]  Aucoin identified this 9 mm spent casing at the scene.[8]  Aucoin also testified that "the weapon was photographed.  It was then put in a bag, and then I transported it to central evidence and property."[9]  On January 1, 2009, at 7:12 a.m., Aucoin delivered the gun and spent casing to central evidence and property clerk, Delores Fleming, who documented them with receipt number 200900030.[10]  Whitfield does not dispute the chain of custody for the gun or spent casing.

On January 5, 2009, Sergeant Byron Winbush, a – now retired – NOPD crime technician, analyzed Grimes's gun and the spent 9mm casing.[11]  In the NOPD scientific criminal investigations division ballistics report, he concluded that:

> Examination revealed that specimen 2 [the fired 9mm cartridge case recovered from the scene] was fired from specimen 1 [Grimes's 9mm glock recovered from the scene].  Specimen 1 was test fired and is functional.[12]

These two sentences represent the entirety of Winbush's documented analysis.  However, Winbush was deposed at length about his analysis.  He stated at his deposition that he tested the gun by firing bullets from Grimes's gun into a water tank.[13]  He then compared the test cartridge cases to the one recovered at the scene to conclude there was a match.[14]  Through this match, Winbush was

---

[5] R. Doc. 122-22.
[6] R. Doc. 122-24 at 2.
[7] *Id.* at 7.
[8] *Id.*
[9] R. Doc. 133-1 at 5.
[10] R. Doc. 122-4 at 11.
[11] R. Docs. 122-1 at 6;  122-9 at 10.
[12] R. Doc. 122-9 at 10.
[13] R. Doc. 122-23 at 2-3 (Winbush testified that "usually it's two rounds that's fired" but did not indicate how many rounds were fired in his test-firing of Grimes's gun).
[14] *Id.* at 4.

able to conclude that the spent casing at the scene was fired from Grimes's gun.[15] He explained that, after his test, he put the evidence into a clear plastic bag, taped it, marked it with his initials, and sent it to the central evidence department.[16] On January 6, 2021, counsel for all parties examined the evidence at the NOPD crime laboratory.[17] They found four casings from the test-firing to be improperly marked in that they were placed in an unlabeled brown paper envelope with a piece of tape labeled "Jefferson Parish Sheriff's Office," not NOPD or NOPD crime laboratory.[18] Also, Winbush's initials did not appear on the envelope.[19]

Defendants did not identify Winbush as an expert in their witness list.[20] Nor did they provide an expert report or expert disclosures. Whitfield requests that the Court "exclude the testimony and any mention at trial [of] an empty shell casing allegedly removed from the decedent Grime [sic] 9mm Glock pistol."[21] In her reply, Whitfield clarifies this request: She says that Winbush should be allowed to testify as a fact witness, not as an expert, but he should "be limited to testifying [that] the Glock 9mm of Grimes appeared functional and did not appear stove piped or jammed, and be barred from expanding his testimony to include his examinations and conclusions that the empty cartridge matched the Grimes 9mm Glock since the evidence was improperly marked and not preserved."[22]

## II.   PENDING MOTION

In her motion, Whitfield argues that testimony from Winbush concerning the spent 9mm casing must be excluded because "Winbush failed to properly test, store, seal, photograph, and

---

[15] *Id.* at 3-4.
[16] *Id.* at 5.
[17] R. Doc. 122-1 at 6.
[18] *Id.* at 6-7.
[19] *Id.* at 7.
[20] R. Doc. 112 at 3.
[21] R. Doc. 122 at 1.
[22] R. Doc. 153 at 2.

label the evidence of any testing done of the 9mm casing."[23] Whitfield claims that there is no proper chain of custody for the tested cartridges.[24] Whitfield argues that because the ballistics report is only a two-sentence conclusion and the evidence from the tests is tainted, there is no opportunity for her to assess Winbush's methodology.[25] Whitfield says that Winbush's failure to perform an industry-standard photographic ballistic comparative test shows that his methodology is flawed.[26]

In opposition, Defendants argue that Winbush was not required to submit an expert report because he was not retained or specially employed to provide expert testimony within the meaning of Rule 26(a)(2)(b) of the Federal Rules of Civil Procedure.[27] Although Winbush is employed by the NOPD, Defendants submit that he did not regularly give testimony so no report was required.[28] Defendants argue that Whitfield's concerns about Winbush's report, methodology, and tests (including the evidence from the tests) can be better addressed during cross-examination at trial rather than through the exclusion of his testimony.[29]

### III.  LAW & ANALYSIS

#### A.  *Daubert* Standard

A district court has discretion to admit or exclude expert testimony under the Federal Rules of Evidence.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997).  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires a district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Rule 702 of the Federal Rules of Evidence provides:

---

[23] R. Doc. 122-1 at 6.
[24] *Id.* at 6-7.
[25] *Id.* at 7-8.
[26] R. Docs. 122-1 at 11-13; 153 at 2.
[27] R. Doc. 133 at 2-4.
[28] *Id.* at 4-5.
[29] *Id.*

4

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. See *Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court listed several non-exclusive factors for a court to consider in assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the methodology in the scientific community. *Id*. at 593-95. However, a court's evaluation of the reliability of expert testimony is flexible because "[t]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quotations omitted). In sum, the district court must ensure "that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152. The party offering the testimony must establish its reliability by a preponderance of the evidence. See *Moore v. Ashland Chem. Inc*., 151 F.3d 269, 276 (5th Cir. 1998).

Next, the district court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence, *i.e*., whether it is relevant. *Daubert*, 509 U.S. at 591. An expert's testimony is not relevant and may be excluded if it is directed to an issue that is "well within the common sense understanding

5

of jurors and requires no expert testimony." *Vogler v. Blackmore*, 352 F.3d 150, 155 (5th Cir. 2003). Further, an expert cannot make "legal conclusions reserved for the court," credit or discredit witness testimony, or "otherwise make factual determinations reserved for the trier of fact." *Highland Cap. Mgmt., L.P. v. Bank of Am., N.A.*, 574 F. App'x 486, 491 (5th Cir. 2014). Ultimately, the expert must "'bring to the jury more than the lawyers can offer in argument.'" *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (quoting *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986)).

### B. Analysis

"The underlying principle of firearm identification is that each firearm will transfer a unique set of marks, known as 'toolmarks,' to ammunition fired from that gun." *United States v. Monteiro*, 407 F. Supp. 2d 351, 359 (D. Mass. 2006). The Fifth Circuit has explained that "the matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades." *United States v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004). Whitfield does not challenge Winbush's qualifications as an expert in firearms identification but limits her opposition to the reliability of Winbush's test. She makes much of the fact that Winbush did not complete a photographic ballistic comparison test on the cartridges to support his conclusion, but instead relied on his own observations. She cites to the following exchange at Winbush's deposition to show the need for a photographic test:

> Q:  Isn't it a fact that [the photographic ballistic comparison] test needs to be done to definitively determine that the two cartridges match? You have to put them under a microscope, I believe it is –
> A:  Yes.
> Q:  – and photograph and see if the striations – if I'm using the right term – the marks on the cartridges from the gun being fired, match; right?
> A.  That's correct.[30]

---

[30] R. Doc. 122-23 at 7.

When read in context, Winbush can be understood to have been answering questions about what the photographic test would have required had he conducted the test, not whether he should have chosen to conduct it. This is confirmed by Winbush's subsequent deposition testimony. When asked shortly thereafter whether the photographic test is an industry standard, Winbush stated: "Not necessarily. It's actually an optional thing because, once again, you're taking a one-dimensional photo of a three-dimensional object."[31] Winbush preferred to do a visual comparison of the recovered casing and the test casings – that is, the three-dimensional objects – as opposed to a comparison of the one-dimensional photographs. Therefore, Winbush's failure to use the photographic test does not support exclusion of his expert testimony, but of course, it can be attacked on cross-examination.

Whitfield also urges the exclusion of Winbush's testimony due to his bare-bones ballistics report and the mishandling of the evidence from his test-firing. But Whitfield fails to show that Winbush needed to include any more in his report to document the match between Grimes's gun and the spent casing based on his visual comparison or that he typically reported more in conducting such examinations. Whether or not the evidence from his test-firing was mishandled is also fodder for vigorous cross-examination but not a basis for exclusion of Winbush's testimony. This is especially true since there is no dispute that Grimes's gun and the spent casing have been preserved and are available to replicate the test-firing and thereby assess the visual comparison test of casings that was the basis for Winbush's report.

For these reasons, the Court finds that Winbush's expert testimony is sufficiently reliable to be admissible.

---

[31] *Id.* at 8.

Even if Winbush's testimony is not excluded, however, the question becomes whether and, if so, how to limit his testimony to protect against overstated conclusions. "The problem is how to admit [ballistics testing] into evidence without giving the jury the impression – always a risk where forensic evidence is concerned – that it has greater reliability than its imperfect methodology permits." *United States v. Glynn*, 578 F. Supp. 2d 567, 574 (S.D.N.Y. 2008). Other courts have prevented firearms examiners from testifying that they are 100% certain of their conclusions. *See, e.g., United States v. Ashburn*, 88 F. Supp. 3d 239, 249 (E.D.N.Y. 2015) (allowing expert to testify that the firearms match was reached to a "reasonable degree of ballistics certainty" or a "reasonable degree of certainty in the ballistics field"); *Glynn*, 578 F. Supp. 2d at 575 (allowing expert to testify the firearms match was "more likely than not"). At oral argument, Defendants' counsel indicated that he intended to offer Winbush's ballistics opinion at this civil trial in terms of "more likely than not." Thus, this Court takes the course marked by its sister courts and will limit this aspect of Winbush's testimony. *But see United States v. Casey*, 928 F. Supp. 2d 397, 400 (D.P.R. 2013) ("[T]he Court declines to follow sister courts who have limited expert testimony … and, instead, remains faithful to the long-standing tradition of allowing the unfettered testimony of qualified ballistics experts."). Therefore, at trial, Winbush will only be allowed to testify that he matched Grimes's gun and the recovered casing to the degree of "more likely than not," but not more.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the motion *in limine* of plaintiff Arabia Whitfield to limit and/or exclude the testimony of Byron Winbush (R. Doc. 122) is GRANTED IN PART and DENIED IN PART. Winbush is allowed to testify as an expert if he is found to be properly qualified at trial, but he must limit the certainty of his overall conclusion to "more likely than not."

New Orleans, Louisiana, this 5th day of May, 2021.

                                          _____
                                          BARRY W. ASHE
                                          UNITED STATES DISTRICT JUDGE