UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ARABIA WHITFIELD, *et al.*            CIVIL ACTION

VERSUS                          NO. 09-1877 c/w 09-8074
                                         PERTAINS TO 09-1877
WARREN RILEY, *et al.*
                                         SECTION M (2)

## ORDER & REASONS

Before the Court is the motion of defendants Warren Riley, Joseph Meisch, Daniel Scanlan, Greg Lapin, Steven Keller, Marcellus White, Julio Alonzo, Larisa Austin, Regina Barr, Colette Booth, and the City of New Orleans (collectively, "Defendants") for summary judgment on qualified immunity.[1] In anticipation of Defendants' motion, plaintiff Arabia Whitfield filed a supplemental brief on the procedure and applicability of qualified immunity.[2] Whitfield also filed an opposition to the motion.[3] Defendants filed a reply in further support of their motion.[4] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons denying the motion for summary judgment.

## I. BACKGROUND

This case arises from the fatal police shooting of Adolph Grimes, III in the early-morning hours of January 1, 2009. Around 2:43 a.m. that morning, NOPD dispatch issued a general alert

---

[1] R. Doc. 198. Defendants also request reconsideration of this Court's May 4, 2021 Order & Reasons (R. Doc. 180) denying Defendants' motion for summary judgment regarding Whitfield's *Monell* claims. R. Doc. 198-1 at 1. Defendants argue that "there is ample evidence in the record to support that the City did not maintain a policy, practice or custom that was the moving force behind any alleged constitutional deprivation of Adolph Grimes' rights." *Id.* In response, Whitfield correctly notes that "Defendants offer no additional evidence, law or analysis in support of their re-urged Motion for Summary Judgment on Plaintiffs' *Monell* claim." R. Doc. 215 at 6. Accordingly, the Court sees no reason to revisit its earlier ruling and the request for reconsideration is denied.
[2] R. Doc. 188.
[3] R. Doc. 215.
[4] R. Doc. 254.

regarding a 911 call reporting a possible shooting at Club Fabulous on North Claiborne Avenue.[5] It was reported that the suspected shooter "fled in white Bonneville."[6] Police officers Lapin, Barr, and Keller investigated inside the club.[7] No evidence was found related to the alleged shooting.[8] However, officers Scanlan and Meisch inspected the parking lot across the street where they testified that they observed a small dark or black vehicle flee the scene.[9] Scanlan and Meisch did not report the sighting to anyone else,[10] nor did any other officers observe the dark or black vehicle.[11]

There were two cars on patrol that night. The lead vehicle was an unmarked white Ford Expedition driven by Scanlan with Meisch in the passenger seat.[12] Lapin (behind the driver), Barr (in the center), and Keller (behind the passenger) were in the backseat (collectively, Scanlan, Meisch, Lapin, Barr, and Keller will be referred to as "the Expedition Group").[13] White drove a red Taurus with Alonzo as his passenger and Austin (behind the driver) and Booth (behind the passenger) in the backseat (collectively, White, Alonzo, Austin, and Booth will be referred to as "the Taurus Group").[14] The Expedition Group departed Club Fabulous to continue their

---

[5] R. Doc. 198-2 at 2.
[6] *Id.*
[7] *Id.*
[8] R. Docs. 198-2 at 2; 215-1 at 4.
[9] R. Docs. 198-2 at 2; 215-1 at 4.
[10] R. Doc. 215-1 at 4.
[11] *Id.*
[12] R. Docs. 198-2 at 1-2; 215-1 at 4. Defendants state that the Expedition was equipped with a blue light and siren. R. Doc. 198-2 at 1-2. Whitfield states that the vehicles had "no markings, sirens, or police lights visible to Mr. Grimes." R. Doc. 215-1 at 1. She further notes that the photographs taken that day at the scene show that the knob used to control the Expedition's siren was broken. *Id.* at 3. Whitfield asserts that McMullen confirmed this fact in his report. *Id.* at 4. She cites to "Exhibit P-2 report McMullen" which presumably corresponds to R. Doc. 215-11 as it was labelled as P-2 by Whitfield in the Court's docket. However, the report makes no mention of the Expedition's knob or its functionality.
[13] R. Doc. 198-2 at 1-2.
[14] *Id.* at 2. Defendants state that the Taurus had a blue light, but make no mention of whether it had a siren. *Id.* Whitfield states that the Taurus did not have a siren. R. Doc. 215-1 at 3.

investigation, meeting the Taurus Group at the corner of North Claiborne and Esplanade Avenues.[15] From there, they proceeded south on North Claiborne.

Spotting a dark or black car on Governor Nicholls Street, the Expedition Group turned right onto the street with the Taurus Group following behind.[16] Meanwhile, Grimes was sitting in the car, which was parked on Governor Nicholls facing North Claiborne, when the two unmarked police vehicles pulled alongside it.[17]

What happened next is the subject of much debate. Defendants assert that Grimes turned off his dome light and pointed a gun at the Expedition.[18] It is undisputed that officer Keller shouted something to the effect of "Gun!"[19] In a matter of seconds, the defendant officers accelerated their vehicles forward to a position past the rear of the parked car and the officers began firing at Grimes.[20] Defendants state that Grimes fired his gun through the rear window of his vehicle in the direction of the Expedition.[21] They assert that Grimes exited his car and "then took off toward and then onto Claiborne Avenue, all while pointing his weapon at the Officers."[22] In contrast, Whitfield attests that Grimes "never fired any shots at officers" and a gunshot wound to his finger rendered "him incapable of firing his Glock 9mm semiautomatic pistol."[23] Additionally, Whitfield notes that "[t]here are no photographs of a 9mm pistol on the body or under the body of Adolph Grimes, III."[24]

---

[15] R. Doc. 198-2 at 2.
[16] *Id.* at 3.
[17] R. Doc. 198-2 at 3; 215-1 at 1.
[18] R. Doc. 198-2 at 3.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] R. Doc. 215-1 at 6.
[24] *Id.* at 3.

3

The defendant officers fired a total of 82 shots at Grimes with 14 reaching their target.[25] Grimes sustained injuries to the front of his body, including to his right lower chest, right liver, both kidneys, adrenal glands, and right lung, and multiple hits to his back.[26]

All nine officers were in plain clothes.[27] Defendants maintain that they activated the blue lights of their vehicles as they approached Grimes's vehicle,[28] while Whitfield says that neither of the officers' cars utilized its flashing lights in approaching Grimes.[29] Officers Meisch and Barr did not fire their guns,[30] and Riley, the NOPD superintendent, was not present at the scene.[31]

## II. PENDING MOTION

While waiting until after the deadline for dispositive motions to file their qualified-immunity motion, albeit without objection from Whitfield, Defendants pronounce that "Qualified Immunity is effectively lost if a case is erroneously permitted to go to trial."[32] For the officers who fired their weapons at Grimes, Defendants argue that their behavior was reasonable, violating no constitutional right, because they were threatened when Grimes pointed his gun at them.[33] Even taking the facts in the light most favorable to Whitfield, Defendants state that "to seize an unarmed, non-dangerous suspect by shooting him dead … is not however, unconstitutional on its face" if the officers believed the suspect posed a threat of serious physical harm to them or others.[34] Defendants argue further that Meisch and Barr could not have violated any constitutional right of

---

[25] *Id.* at 1, 5.
[26] *Id.* at 1.
[27] R. Doc. 198-2 at 2. Defendants state that they were wearing NOPD badges. *Id.* Whitfield asserts that they did not have "any uniforms or badges visible to Mr. Grimes … and did not identify themselves as police officers." R. Doc. 215-1 at 1.
[28] R. Doc. 198-1 at 3.
[29] R. Doc. 215-1 at 3.
[30] R. Docs. 198-2 at 3-4, 215-1 at 2.
[31] R. Doc. 198-2 at 3.
[32] R. Doc. 198-1 at 6-7.
[33] *Id.* at 25.
[34] *Id.* at 15-16.

4

Grimes because they did not fire their weapons.[35] Defendants also seek to distinguish Riley because he was not present when the shooting took place.[36]

In her opposition, Whitfield contends that there are genuine disputes of material fact that must be resolved by the jury before deciding whether qualified immunity applies.[37] She explains that in an attempt to pass over highly disputed issues, Defendants only cite to their own statements while ignoring documents and testimony to the contrary.[38]

## III. LAW & ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate

---

[35] *Id.* at 12-14, 22-23.
[36] *Id.* at 10-12. After reexamining the issue (which was raised by Defendants' earlier motion for summary judgment regarding Whitfield's *Monell* claims), the allegations Whitfield makes against Riley are more properly understood to relate to her *Monell* claims and Riley's role as superintendent, acting in an official capacity on behalf of the City of New Orleans, than to any amorphous, unspecified claim against him in his individual capacity. As Whitfield has alleged no identifable claim against Riley in his individual capacity, any such claim against him is dismissed.
[37] R. Doc. 215 at 7-12.
[38] *Id.* at 12-13.

5

the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475

U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

B. Analysis

1. **Qualified immunity**

Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The defense provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Qualified immunity requires a two-step analysis. "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Tolan*, 572 U.S. at 655-56 (quotation and alterations omitted). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at

the time of the violation." *Id.* at 656. The steps can be analyzed in any order. *Pearson*, 555 U.S. at 236 ("On reconsidering the procedure required in *Saucier* [which called for the violation inquiry to be addressed first], we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

"The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan*, 572 U.S. at 656 (quotations and alterations omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar Cty.*, 560 F.3d 404, 410 (5th Cir. 2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). If both questions are answered in the affirmative, qualified immunity does not apply. *Id*.

### 2. Excessive force under the Fourth Amendment

The constitutional right in question is the right to be free from excessive force. "To state a violation of the Fourth Amendment's right to be free from excessive force, a plaintiff must show a seizure, plus: (1) an injury (2) resulting directly and only from the use of force that was excessive to the need; and (3) that force was *objectively unreasonable*." *Hudspeth v. City of Shreveport*, 270 F. App'x 332, 336 (5th Cir. 2008) (emphasis in original). In an excessive force claim, the key inquiry is whether an "officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). "In making this determination, [courts] must be mindful that police officers are 'forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Mace v. City of Palestine*, 333 F.3d 621, 624

(5th Cir. 2003) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). As the Fifth Circuit has explained:

> Under the Fourth Amendment, it is unreasonable for an officer to seize an unarmed, nondangerous suspect by shooting him dead. It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.

*Winzer v. Kaufman Cty.*, 916 F.3d 464, 474 (5th Cir. 2019) (quotations and citations omitted). However, "'an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.'" *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) (quoting *Lytle*, 560 F.3d at 413).

### 3. Resolution of qualified immunity must await trial

On a motion for summary judgment involving qualified immunity, courts must "accept the plaintiff's version of the facts as true and review it through the lens of qualified immunity." *Samples v. Vadzemnieks*, 900 F.3d 655, 660 (5th Cir. 2018).[39] In this case, when taking the evidence "in the light most favorable to the party asserting the injury, … the officer's conduct violated a federal right." *Tolan*, 572 U.S. at 655-56 (quotation and alterations omitted). Here, Whitfield maintains that Grimes was sitting in his car, waiting on his cousin, when the defendant officers pulled up beside him in unmarked vehicles and opened fire.[40] Whitfield asserts that Grimes never fired a shot at the officers,[41] nor was Grimes running or pointing a gun when the defendant officers continued to shoot at him.[42] She explains that "[t]he officers clearly shot the

---

[39] *See also Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) ("Like the district court, we must view the facts and draw reasonable inferences in the light most favorable to the plaintiff and ask whether the defendant would be entitled to qualified immunity on those facts."); *Williams v. Bramer*, 180 F.3d 699, 702 (5th Cir. 1999) ("We then review the evidence bearing on those issues, viewing the facts and inferences to be drawn in a light most favorable to the non-moving party.").
[40] R. Doc. 215 at 2.
[41] R. Doc. 215-1 at 6.
[42] *Id.* at 5.

9

Deceased Grimes multiple times once he was on the ground and was clearly no threat what-so-ever to anyone."[43] Under Whitfield's version of the incident, if the key inquiry is whether "an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others," *Mace*, 333 F.3d at 624, the Court would be hard pressed to conclude that Defendants did have such reasonable belief and that their deadly force was not unreasonable. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). As the Fifth Circuit notes: "The Supreme Court has stated that this rule can be sufficient in obvious cases, and this court has applied it in such cases, without dependence on the fact patterns of other cases." *Cole*, 935 F.3d at 453. Taking the facts in the light most favorable to Whitfield, officers firing 82 shots at a man sitting in a parked car, and then at him when fleeing the car after the shooting commenced, would constitute an obvious violation of a clearly established right. Alone, this requires that the Court deny Defendants' motion for summary judgment, but it does not foreclose Defendants' qualified immunity for purposes of the case.

Defendants claim they had reason to believe Grimes posed a threat of serious harm because he pointed a gun at them, fired on them, and ran from them while continuing to point a gun at them. Defendants argue that officer Keller's shout of "Gun!" or "He has a gun!," and their own observations, made reasonable such belief and prompted the ensuing gunfire from the officers. Defendants correctly insist that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an

---

[43] *Id.* at 1-2.

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396-97. Thus, Whitfield's version of the facts and circumstances of the incident are hotly disputed by Defendants.

"Objective reasonableness is a matter of law for the courts to decide, not a matter for the jury. However, underlying historical facts may be in dispute that are material to the reasonableness determination." *Williams*, 180 F.3d at 703 (citation omitted). "If a factual dispute must be resolved to make the qualified immunity determination, that fact issue is material." *Amador v. Vasquez*, 961 F.3d 721, 727 (5th Cir. 2020) (quotation and alteration omitted). When there are genuine issues of fact that are material, the case should proceed to trial. *Id.*; *see also Cole*, 935 F.3d at 446 ("When those [qualified immunity] processes do not yield pretrial resolution, as with competing factual narratives, the full reach of qualified immunity gives way to a trial, the first point at which its application is determinable."); *Williams*, 180 F.3d at 703 (reversing in part district court's finding of qualified immunity when "the relevant facts are hotly contested").

In this case, the Court cannot decide whether the officers acted in an objectively reasonable manner without the jury's resolution of the underlying factual disputes.[44] Like the Fifth Circuit in *Amador*, the Court "find[s] that if a jury accepts Plaintiffs' version of the facts as true, particularly as to what occurred in the moments before the deputies shot [the decedent], the jury could conclude that the officers violated [the decedent's] clearly established right to be free from excessive force." 961 F.3d at 730; *see also Cole*, 935 F.3d at 457 ("What [officers] knew before shooting at

---

[44] This is as true for defendants Meisch and Barr, who are said not to have fired their weapons, as for the rest of the Defendants. Whitfield alleges that the officers essentially acted as a single unit in the events leading to Grimes's death. The application of qualified immunity to the officers can be analyzed collectively. The Fifth Circuit has explained that "[b]ecause it is alleged that the officers acted in unison, we need not separately address the qualified immunity analysis for each officer." *Amador v. Vasquez*, 961 F.3d 721, 727 n.5 (5th Cir. 2020). *But see Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018) ("In cases where the defendants have not acted in unison, 'qualified immunity claims should be addressed separately for each individual defendant.'") (quoting *Kitchen v. Dall. Cty.*, 759 F.3d 468, 480 (5th Cir. 2014)).

[plaintiff], whether they warned him before doing so, and what actions [plaintiff] took before being shot are all disputed."). In another such case, the Fifth Circuit, sitting en banc, has likewise observed: "We conclude that it will be for a jury, and not judges, to resolve the competing factual narratives as detailed in the district court opinion and the record as to the … excessive-force claim." *Cole*, 935 F.3d at 447. Because there are hotly contested issues of material fact concerning the incident involving Grimes and Defendants, summary judgment is not appropriate and qualified immunity cannot now be determined, but must await resolution of the underlying historical facts at trial.

IV. **CONCLUSION**

Accordingly, for the foregoing reasons,

IT IS ORDERED that the motion of defendants Warren Riley, Joseph Meisch, Daniel Scanlan, Greg Lapin, Steven Keller, Marcellus White, Julio Alonzo, Larisa Austin, Regina Barr, Colette Booth, and the City of New Orleans for summary judgment on qualified immunity (R. Doc. 198) is DENIED.

IT IS FURTHER ORDERED that any claims against Warren Riley in his individual capacity are DISMISSED.

New Orleans, Louisiana, this 24th day of June, 2021.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE